CLERK, U.S. DISTRICT COURT

JUL 13 2020

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

YEHONATAN KAPACH, Plaintiff pro se
ADDRESS: 18375 Ventura Blvd, Suite 341, Tarzana, CA 91356
TEL: 818-571-6460, E-mail: k2660000@gmail.com

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| YEHONATAN KAPACH, | CASE NUMBER: |
|---|---|
| Plaintiff, | |
| against | **COMPLAINT** |
| | CV20-6277- DDP (MAAx) |
| INTEL CORPORATION, DIKLA KLEIN YONA, YEHORAM SHAKED, ESTHER HAUT, DAPHNA BARAK EREZ, ANAT BARON, YAEL VILNER, EDNA ARBEL, DAVID MINTZ and GEORGE KARA. | |
| Defendants, | |

Plaintiff, pro se, for his complaint, alleges and sets forth as follows:

1. This is a complaint by an employee of Defendant Intel Corporation ("Intel") and several public officials in the State of Israel, who have reduced the Plaintiff into a slave, extracting labor from him for a period of 4 months without compensation.

2.      Plaintiff's entire salary was transferred by Defendant Intel to the State of Israel by an order of Defendant Dikla Klein Yona to satisfy a phantom debt for fictitious and stale child support that was wholly paid years ago, leaving with no money Plaintiff and his new wife and two new children as well as the daughter from the first marriage who moved to his custody in January 2013.

3.      The enslavement of Plaintiff became possible against a background of a radical feminist ideology that prevails in the Court State of Israel, and is promoted and enforced by the co-Defendants named in the caption, who are judges in Israel that make it impossible for a man to evet "win" a family case in that country, and it has led to countless events of suicide (about 200 per years), impoverishment, denial of any human rights, denial of due process and fair trial, and rendering men into slaves by robbing them of their ability to survive, and/or a minimum modicum of living.

4.      This branch of radical feminism has no counterparts in any other country in the world.  The co-defendants who behave and practice traits similar to a hate cult, preach men hating, denigrating men to a form of a sub-human creature, an animal whose life can be spared, who has no emotions, and his only purpose in life is to manufacture money for women.  They strongly believe in the illusion that all men and specially Jewish men are the most violent men in the world, and that the men of Israel belongs to a secret patriarchy that mandates it members to use and abuse women for sexual pleasures, and to stop women from promoting their independence and careers.

5.      In light of this cult ideology, the co-defendants falsely interpret laws, invent and fabricate facts that never happened, write nasty and humiliating orders and judgments against men that have no resemble to reality or truth, and they all in tandem committed to their only purpose in life which is to steal and rob money from the hands of Jewish men and transferring the money to the hands of Jewish women, purportedly to compensate for the "crimes of the patriarchy".

6.      The causes of action in this case are based on the Torture Victim Protection Act of 1991 (TVPA"), the Alien Tort Statute, 28 U.S.C. § 1350), ("ATS"), the International Convention to Suppress the Slave Trade and Slavery of 1926 (the " Slavery Convention" signed by the US in 1956, the Supplementary Convention on the Abolition of Slavery of 1956, the ILO Co 29 Forced Labor Convention, 1930 and ILO C105 Abolition of Forced Labor Convention, 1957.

## PARTIES

7.      Plaintiff is 51 years old, and he is a "citizen" and "resident" of the State of Israel.  He recently managed to lift a no exit order imposed on his for the past 20 years by paying off (the ransom) an entirely fictious and bogus child support "debt" dating back to 2013 and came to live in Los Angeles.

8.      Plaintiff is a father of 3 children, two from a second relationship and one from a previous marriage, who is child for whom the child support was sought.  That child actually lived in his custody since January 1, 2013.

9.      Plaintiff is also a human rights activist.  When Plaintiff realizes that the Israeli courts are no courts of justice and instead are a circus where men are thrown into a gladiators' arena, with no chance of coming out to be eaten alive by the radical feminist, Plaintiff joined with others and formed Fathers for Justice, a non-profit organization registered in Israel and recognized by the UN as a civil society.  Because of his status as an "activist" for human rights, Plaintiff is blacklisted and persecuted by the Judiciary of Israel as an animal.

10.     Plaintiff work for Defendant Intel for a period of 3 years.

11.     Defendant Intel Corporation American multinational corporation and technology company headquartered in Santa Clara, California, with offices in Los Angeles as well. It is the world's largest and highest valued semiconductor chip manufacturer based on revenue, and is the inventor of the x86 series of microprocessors, the processors found in most personal computers (PCs). Intel ranked No. 46 in the 2018 Fortune 500 list of the largest United States corporations by total revenue.  Upon information and belief, Intel is incorporated in Delaware.

12.     Defendant Dikla Klein Yona is a citizen and resident of the State of Israel.  She works as a magistrate handling collections of child support by women from men at the Israel Enforcement and Collections Authority in the city of Tel Aviv.  All of her "clients" are women, because in the State of Israel women are exempt from paying child support, and their incomes are exempt from contributing to the child's maintenance. Despite all human rights conventions

which Israel signed, there is no equality between men and women since only the man is responsible to pay regardless of his income, and regardless of whether he has an income or ability to work at all and even if he is a disable father wounded in a battle and using a wheel chair.

13.     Defendant Dikla Klein Yona is the person who **refused** to give Plaintiff a chance to have his day in court and prove that the child support "debt" is fictitious. She ordered that Plaintiff's full and entire salary be garnished until a bogus debt in the amount of $ 34,000 124,000) NIS ( is extracted, that all his credit cards be suspended and unusable, that all his bank accounts be lined and the funds the in transferred to the former wife, that a no exit order shall continue, that all his pension and retirement funds be liquidated, and that within a certain amount of months of non-payment, Plaintiff shall be arrested and incarcerated (usually for 21 days every 3 months).

14.     Defendant Yehoram Shaked is a citizen and resident of the State of Israel. He is a controversial family court judge in the City of Tel Aviv. He was the subject of quite a few investigatory news exposés involving corruption. He refused to hear Plaintiff's appeal and dismissed it.

15.     Defendants Esther Hayut, Daphna Barak Erez, Anat Baron, Yael Vilner, Edna Arbel, David Mintz and George Kara are citizens and resident of the State of Israel.

16.     Defendants Esther Hayut, Daphna Barak Erez, Anat Baron, Yael Vilner, Edna Arbel, David Mintz and George Kara have an address at Bet Mishpat Elyon, 1 Kiryat Hamemshala, Jerusalem, Israel.

17.     Defendants Esther Hayut, Daphna Barak Erez, Anat Baron, Yael Vilner, David Mintz and George Kara are Israel Supreme Court judges, and Edna Arbel is a former Supreme Court judge.  They belong to a cult of radical feminists' ideology who promote hatred and contempt towards men, female supremacy and the enslavement of men to serve the needs and whims of women.  These defendants systematically deny each and every application, motion or complaint by a man seeking fair justice, or even to be treated equally without discrimination and they direct all other judges and others in judicial or administrative capacity to copy them.  They systematically deny Due Process and human rights of men (both domestic and international), and they issue decisions always prefer the women's position or version no matter what.

18.     Defendants Esther Hayut, Daphna Barak Erez, Anat Baron, Yael Vilner, Edna Arbel, David Mintz and George Kara integrate the influenced theories of  Andrea Dworkin, Catharine MacKinnon, Valerie Solanas, and Alice Walker as if their writings are the Constitution of Israel.

19.     Defendants Esther Hayut, Daphna Barak Erez, Anat Baron, Yael Vilner, Edna Arbel, David Mintz and George Kara systematically disregard and ignore human rights of men and their children's rights by international law by knowingly and repeatedly allowing the other Israeli co-defendants to rob men of their assets, properties, salaries, persons and so on, and transfer the wealth to the hands of women.

20.     Defendants Esther Hayut, Daphna Barak Erez, Anat Baron, Yael Vilner, Edna Arbel, David Mintz, George Kara, Yehoram Shaked, Dikla Klein Yona are hiding under the immunity that judges have in Israel and trusting that their immunity will never stand a test of the enlightened world. As a result, they are seriously injuring the human rights of citizens of the State of Israel.

21.     Defendants Esther Hayut, Daphna Barak Erez, Anat Baron, Yael Vilner, Edna Arbel, David Mintz, George Kara, Yehoram Shaked, Dikla Klein Yona, Since the coup of former Supreme Court President Aharon Barak, the judges have been taking advantage of the fact that the Israeli government is so weak and frightened and they do not bother to judge by law and in fact they are judging by an anti-law agenda and doing whatever that come in their minds.

## JURISDICTION

22.     This Court has subject matter jurisdiction over this action under Torture Victim Protection Act of 1991, also ATS - The Alien Tort Statute (28 U.S.C. § 1350; ATS), also called the Alien Tort Claims Act, the U.S. Foreign Corrupt Practices Act (FCPA), Sections 13(b)(2)(A) and 13(b)(2)(B) of the Securities Act (15 U.S.C. § 77q(a)), the Slavery Convention and the Convention against Forced Labor.

## VENUE

23.     Venue is proper in the Central District of California.  Venue is proper in this Court pursuant to 28 USC § 1391 and 18 USC § 2334.   A substantial part of the activities and decision making underlying the slavery originated in this District from Intel's office at 26630 Agoura Road, Calabassas 91302.  Defendant Intel is located in this District, and moreover products produced in the location where Plaintiff worked are sold widely in this District in violation of California Consumer Protection Laws, Cal. Civil Code §1950, et seq, the Consumer Legal Remedies ACT (CLRA), CA Business and Professions Code §17200 et seq, and the Unfair Competition Law (UCL).

## FACTS

24.     As stated, Plaintiff is a forced citizen and resident of the State of Israel, currently living in Los Angeles after he managed to leave Israel following a period of 20 years and has exit order and being forbidden from leaving the country.

25.     Plaintiff is now 51 years old (born July 14, 1969).  He was married and had a daughter but in May 2002 his former rich wife opened a child support case in the Family Court in the city of Tel Aviv in Israel against him.  Shortly after that in December 24, 2002 he divorced that wife.

26.     Plaintiff paid all child support timely as ordered in the amount of 1,180 NIS (approximately $320 USD).  Despite paying timely and regularly the former wife opened a child

support collection case at the Israeli Enforcement and Collection Authority, Child Support Unit in November 2004.

27.     The former wife maliciously and falsely launched her child support collection in the amount of 1,800 NIS (approximately $500) instead of 1,180 NIS.  She had let this case accumulate debts collected huge interest despite being paid fully on time, and without the knowledge of Plaintiff.

28.     In order around January 1, 2013, when the daughter was 14 years old, the former wife decided to abandon her and travel overseas.  As a result, the daughter was placed in the custody of Plaintiff, and the mother was automatically exempt from paying child support, despite her becoming non-custodian, simply because she is a woman.

29.     Needless to say that in the rad-fem State of Israel, the former wife who became non-custodian was exempt from paying child support to the Plaintiff, solely because she is a woman and as such enjoys the privileges of a preferred citizen of the State, and the State's express public policies of discriminating against men in every way possible.

30.     When the daughter reached the age of 21, in or around September 2018, Plaintiff filed an application with the Israeli Debt Collection to discharge the false debt accrued based on the initial false manipulation of the numbers and figures by the former wife.  That application reached the desk of the Collection Magistrate Defendant Dikla Klein Yona.

31.     The former wife conceded that she falsely inflated the opening sum of her collection case and accumulated 73,100 NIS ($19,750) in child support that was never owed.  She conceded that she was paid child support, and that she did receive it regularly until she gave up the child, however the recalculation of the false charges did not eliminate the usurious interest rates that the court of Israel applies to its male population when collecting child support, as well as the Cost of Living escalations, and as a result a sum of approximately 124,000 NIS (approximately $34,000) was not discharged.

32.     Plaintiff made several petitions to Defendant Dikla Klein Yona protesting these false debts with proof that he paid all changes directly to the former wife and there are no open debts, however Defendant Dikla Klein Yona refused to accept the proof, the receipts and an accountant certification, and also **refused** to schedule a hearing.

33.     In October 2-3, 2019 Plaintiff was invited by the UN Committee on Social, Economic and cultural rights to participate in hearings to assess Israel's compliance with the UN human rights convention.

34.     Plaintiff made a special application to lift the no exit order so that he can give testimony in the UN in Geneva. The Collection Magistrate allowed Plaintiff to travel provided he files bonds and assurances.

35.     When Defendant Klein Yona was notified by the (Hanhalat Batey Hamishpat) unlawful Tracking Unit Headquarters of Court that Plaintiff is about to travel to the UN, in retaliation on

September 25, 2019, Defendant Klein Yona issued an final judgment dismissing all his open claims against the false calculations and false interest charges, and resumed all enforcement proceedings against the Plaintiff, and she has ordered the Enforcement and Collection Authority to impose on Plaintiff every possible limitation on his life, liberty and properties including no exit order, liens on all his bank accounts and credit cards, and a 100% garnishment on his salary. Defendant Dikla Klein Yona also ordered *ex parte* and sua sponte the forfeiture of the cash bond deposited to secure the travel to the UN, valued at a few thousand dollars.

36.     That means that every penny he earns in wages must be transferred by the employer to the Enforcement and Collection Authority as of October 3, 2019.

37.     On or about October 28, 2019 Plaintiff filed an appeal on the decision of Defendant Dikla Klein Yona, and that appeal was handled by Judge Yehoram Shaked of the family Court in Tel Aviv.

38.     Defendant Shaked issued an order on November 7, 2019 demanding that Plaintiff pay into the Court a bond in the sum of 5,000 NIS ($1,350), despite the fact that all of Plaintiffs accounts were placed under liens, his credit cards suspended and his employer was ordered to transfer Plaintiff's salary in its entirety to the Enforcement and Collection Authority.

39.     Plaintiff was left without one penny to live on, despite the fact that he now has a new common-law wife with whom he made two children and had a new wife (Cancer patient, Leukemia) to feed and support them, as well as the daughter for whom the old child support debt was supposed to be "collected".

40.     On or about November 13, 2019 Plaintiff filed an application to exempt him from paying a bond, because he had no sources of money to pay it, and/or. At minimum to release for him a minimum sum for basic subsistence. In response Defendant Shaked order the Plaintiff to panhandle and eventually denied the application and even sanctioned Plaintiff in the sum of 1,500 NIS ($415) for having "troubled" and harass the Judge with such application, and another sum of 1,500 NIS for using "inappropriate" language.

41.     Eventually, on January 8, 2020 Defendant Shaked dismissed the appeal on the decision of Defendant Dikla Klein Yona for non-payment of the bond.

42.     As soon as Plaintiff returned from Geneva and found out about all the collection restrictions imposed upon him, he contacted Mr. Mark Bitton, his direct manager and other officials and principals at his employer Defendant Intel, and implored them to refuse to transfer his entire salary to the Enforcement and Collection Authority, because that would mean that he works "for free" as a slave, and that if he is not allowed a minimum amount for basic subsistence, then he becomes a victim of coerced labor.

43.     In or around October 2019 the officials at Defendant Intel told him that they would examine the legal situation and consult with Intel's headquarters in the United States and promised him assistance to the full extent possible.

44.     On December 2, 2019 Plaintiff had a meeting with Defendant Intel's Human Resources officer and warned her that if Intel would not file a protest with the Enforcement and Collections Authority, they it will be deemed violating the Conventions against slavery and forced labor.

45.     A few weeks later Plaintiff had another meeting with another Intel representative Mr. Matan Kurner, and Plaintiff repeated the same warning. At that time Mr. Kurner told Plaintiff that Intel USA directed them to obey the wage garnishment order and forward all the salary in its entirety to the State of Israel.

46.     Given this news, in order not to work for nothing, Plaintiff asked to be released on vacation without pay until the end of the legal proceedings, but Mr. Kurner said it is not possible.

47.     While Plaintiff was waiting for a word from Intel headquarters, Intel took Plaintiff's salary in its entirety and sent it to the Enforcement and Collections Authority for the months of October through January 2019, allegedly in compliance with a wage garnishment order.

48.     By doing so, Intel rendered Plaintiff into a slave, a person who works full time and receives no remuneration in return for a period of 4 months.  Defendant left Plaintiff and his new family with nothing to eat.

49.     It should be noted that Intel could have protected Plaintiff by making its own application to the Enforcement and Collections Authority and stating that they refuse to turn its own loyal employee into a slave.

50.     Finally, when Plaintiff learned that he will never get any justice from the Israeli Courts and in particular from Judge Shaked or any judge else, and that even if he appeals, he will again be required to file a bond, which he doesn't have, and that his family is suffering on the verge of starvation, Plaintiff's old and sick parents (Over 80) took a loan and paid off the debt at the Enforcement and Collections Authority.

51.     After that, Plaintiff purchased a ticket and came to stay in Los Angeles.

## GENERAL BACKGROUND

52.     In the past 30 years, the State of Israel has been overtaken by a fanatical cult of radical feminists' ideology.  Defendant Edna Arbel before she joined the Supreme Court in 2004 was Chief State Prosecutor.  She drafted guidelines which exempt women from prosecution for filing false complaints.  Instructions were given to the police that in any case of altercation between a man and a woman, the man must be arrested, and removed from his home for a minimum of 15 days.

53.     When Defendant Arbel joined the Supreme Court, she has infected the entire court with her hate mongering rhetoric, that women are victims of the patriarchy, that women never lie and that women are fragile and sensitive creatures that can never lay hands on a man.  She spiced her rhetoric with citations from McKinnon and other members of the rad-fem cult.

54.      Needless to say, that Defendant Arbel herself filed a false claim against her son in law Eyal Baumgart (himself a judge) who was divorcing her daughter claiming that he is a pedophile fondling his own children sexually.

55.      Defendant Arbel later retired in 2014 and immediately she was appointed in a secret procedure, as head of a secret "Committee of Two", a screening unlawful committee that filters out all candidate for the Judiciary.  She was given immense powers to promote only radical feminists to positions of judgeship, and any other person whose sample writings do not contain explicit hate words towards men was thrown out.

56.      Meanwhile another radical feminist Daphna Barak Erez who was Dean of the Law School in Tel Aviv was promoting this ideology by writing articles and books, all contaminated with preaching of female supremacy.  Based on these writings she recommended for a position as a Supreme Court Judge in 2012, and indeed she became very influential judge.

57.      Slowly but surely the State of Israel became one big jail for men.  The child support "laws" were interpreted as if men are the only parent responsible for child support, and women are exempt from contributing one penny.

58.      Child support rates in Israel became the highest in the world, 2 or three times higher than US and Australia, and much more than that compared with Continental Europe.  The usurious child support "awards" in Israel became an instrument to take money from men and transfer it to women.  For example, after Israel who is at the top list of OECD countries surveyed stands Switzerland.  There the rates are slightly lower than Israel, but a Swiss employee makes about 4 times more in salary than an average Israeli man.

59.      The laws of custody were already in favor of women.  Article 25 of the Capacity and Guardianship Law states that women get automatic custody (the antique Tender years presumption).  This was also interpreted to give women veto powers on the amount of child access they wish to grant their former husbands.

60.      In many occasions, Daphna Barak Erez and Defendant Yael Vilner said that this complies with international law, and with women's claims for "equality between the sexes", however absurd this claim is.

61.      In the area of divorce law, the rad fem began enforcing strictly the Ketuba.  That is a religious deed given by the bridegroom to the bride at the time of marriage and it contains a symbolic figure, which the husband promises to pay the woman if he no longer desires to accept the sexual favors of the wife.  Although this is purely a symbolic instrument of marriage, and if taken literally is reduces a woman into an objectified servant of the husband, whose sexual services are sold for the duration of the marriage, Defendants Arbel, Barak Erez, Baron and Vilner had no problem holding that the Ketuba can be used as a civil contract, just because it can yield women tens of thousands of dollars and even hundreds of thousands of dollars.

62.      In the area of domestic violence, these defendants, as members of the cult, have eliminated all rules of evidence in criminal cases so it can be as easy to convict a husband for

violence, spousal rape or sexually indecent conduct with children, as easy as making an omelet.  They have encouraged every woman who wishes to divorce to start her journey at the police and concoct every imaginable false claim they can think of.

63.       As a result, hundreds of men in divorce or divorce proceedings commit suicide, tens of thousands of men find their salaries being garnished to satisfy child support awards that can even exceed the salary, many of them lose their jobs and find themselves embroiled in horrendous violence and rape, they gave to spends thousands of dollars on lawyers, on examinations to prove parental fitness, and on court fees and appeals bond.

64.       In short, the Defendants (except Intel) have made it impossible for a man to prove his case in an Israeli court, whether in a custody case, child support or a criminal case.  There simply is no law and no justice in the Israeli courts dominated by these Defendants.

## FIRST CAUSE OF ACTION

65.       Plaintiff repeat and reallege all facts and circumstances described above as if fully set forth as truth herein.

66.       Defendant Intel's acts described above constitute outrageous conduct and acts of enslavement and forced labor contrary to the domestic laws and the international treaties mentioned above.

67.       Defendant Intel intended or acted in concert to intend to cause the enslavement and/or forced labor to the Plaintiff, by conduct which was intentional and malicious and done for the purpose of causing Plaintiff to be a victim of torture, suffer humiliation, mental anguish, and emotional and physical distress.

68.       Needless to say that by reason of transferring the entire salary of Plaintiff to the State of Israel, without any protest that such situation would leave a man (and loyal employee) who the provider for a common law and three children without any food or anything or any money to live from, Defendant Intel knew and should have known that Plaintiff and his family will be facing starvation.

69.       Alternatively, Defendants engaged in the conduct with reckless disregard of the probability of causing Plaintiffs to suffer from starvation, inability to pay debts and bare necessities, humiliation as a slave and emotional distress, Plaintiff was present within the zone of danger of Defendants' acts, and Defendant knew that Plaintiff was so present and likely to so suffer.

70.       As a proximate result of defendant Intel's act or omissions Plaintiff suffered the damages described including severe humiliation, mental anguish, and emotional and physical distress, and has been injured in mind and body.

71.       The emotional distress suffered by Plaintiff was serious or severe.

72.     Plaintiff is therefore entitled to recover from the Defendant Intel the sum of $20 Million dollars.

## SECOND CAUSE OF ACTION

73.     Plaintiffs repeat and reallege all facts and circumstances described above as if fully set forth as truth herein.

74.     Just like the Plaintiff, there are many Israeli men who are in divorce or divorce proceedings who are in similar situation, and their salaries are being "eaten" by Intel who transfers them to the hands of the Enforcement and Collections Authority of Israel, either in full (thus leaving the employee nothing to live on, or no choice but to quit his job), or these transfers are products of discriminatory awards of child support that are undue, and would not have been awarded if there was equality between men and women.

75.     Defendant Intel is in a position of power towards the State of Israel, as the State is courting Intel to invest and provide jobs.  Each year, the State of Israel gives Intel about 1 Billion NIS (about 270 Million USD) in cash just to keep Intel factories open in Israel.  In fact, on December 4, 2019 Israel's parliament confirmed an addition incentive grant to Intel in the amount of 4 Billion NIS (about $1.080 Billion dollars).

76.     Thus, it is within Intel's powers and abilities to protest and refuse to transform its male employees into employees of slavery and servitude.  Especially since Intel had a lot of leverage in these negotiations concerning the grant.  Intel could have negotiated an exclusion of its male employees from the application of the discriminatory, arbitrary, and atrocious child support regime in Israel that reduced men to a sub human creature.

77.     Each year Intel issues an "Anti-Slavery and Human Trafficking Statement" (the Anti-Slavery Statement", which is made in order to comply with California Transparency in Supply Chains Act of 2010 (SB 657) and the United Kingdom Modern Slavery Act of 2015 which require businesses to provide disclosures concerning their efforts, if any, to address the issues of slavery and human trafficking in their supply chains.

78.     According to Defendant Intel's 2018 Anti Slavery Statement: "similarly, the revised Federal Acquisition Regulation (FAR) 52.222-50 (''Combating Trafficking in Persons'') and new FAR provision 52.222-56 (''Certification Regarding Trafficking in Persons Compliance Plan'') are aimed at removing slavery and human trafficking from the U.S. Federal Government contracting supply chain.

79.     According to Defendant Intel's 2018 Anti Slavery Statement:  "This Slavery and Human Trafficking Statement responds to the California and U.K. Acts, and reflects Intel's efforts to combat the conduct prohibited by the FAR's anti-slavery and anti-trafficking provisions. The statement aims to provide consumers detailed information to make better, more informed choices about the products and services they buy and companies they support. Our statement covers Intel Corporation and its subsidiaries, including but not limited to, Intel

Corporation (UK) Ltd. For additional information about Intel and its operations, refer to the 2018 Annual Report on form 10-K".

80.     Moreover, according to Defendant Intel's 2018 Anti Slavery Statement:  "Intel is committed to maintaining and improving systems and processes to avoid complicity in human rights violations related to our operations and supply chain. Intel recognizes that slavery and human trafficking can occur in many forms, such as forced labor, child labor, domestic and indentured servitude, sex trafficking, and workplace abuse. Throughout this statement we use the terms "slavery and human trafficking" to encompass all forms of coerced labor.  At Intel, we take steps to minimize the risk of slavery and human trafficking in our operations and supply chain. Our commitment and integrated approach to human rights includes provisions on avoiding risks such as slavery and human trafficking in these documents: (a) Intel Global Human Rights Principles, (b) Intel Code of Conduct, (c) Responsible Business Alliance (RBA) Code of Conduct, (d) Trafficking in Persons Federal Government Purchasing Policy , (e ) UN Global Compact".

81.     When Plaintiff was recruited, he was presented with a similar statement (applicable to that year) and was required to sign it.  Little did Plaintiff know that he himself will become a slavery victim himself by Intel.

82.     In California, in response to consumer demands, the California Legislature passed the California Transparency in Supply Chains Act of 2010 (the "Act"), Cal. Civ. Code §1714.43. The Act addresses the market for goods and products "tainted" by slavery and human trafficking—crimes that are outlawed by state, federal, and international law. *Id.*  In enacting the California Transparency Act, the Legislative Counsel's Digest stated that "consumers are inadvertently promoting and sanctioning these crimes through the purchase of goods and products that have been tainted in the supply chain." *See* Legis. Counsel's Dig., Sen. Bill 556, ch. 556, §2(h), (2010 Reg. Sess.).

83.     The Legislature in CA further stated that: "[a]bsent publicly available disclosures, consumers are at a disadvantage in being able to distinguish companies on the merits of their efforts to supply products free from the taint of slavery and trafficking. Consumers are at a disadvantage in being able to force the eradication of slavery and trafficking by way of their purchasing decisions. *Id.* at § 2(i).

84.     The Act recognizes that consumers are deeply concerned about the way in which their products are made and would alter their purchasing practices if they knew their products were tainted by slavery and human trafficking.

85.     The Act, therefore, requires businesses with an annual gross of over $100 million to "disclose their efforts to eradicate slavery and human trafficking from their direct supply chains." *See* Cal. Civ. Code §1714.43(a)(1).  This imposes an affirmative duty on Defendant Intel to eradicate slavery and work in debt bondage.

86.     The California Transparency in Supply Chain Act ("the Act"), Cal. Civ. Code § 1714.43, was signed into law in October 2010. The Act addresses the market for goods and products

"tainted" by slavery and human trafficking—crimes that are outlawed by state, federal, and international law. *Id.* This statute recognizes that consumers should not be forced to promote slavery and human trafficking through their purchasing practices. Therefore, businesses such as Costco are required to "disclose their efforts to eradicate slavery and human trafficking from their direct supply chains." *Id.* at § 1714.43(a)(1).

87.      Such disclosure should include a statement that addresses the extent that the company:
(1) engages in verification of product supply chains to evaluate human trafficking and slavery,
(2) conducts audits of suppliers to evaluate supplier compliance with company standards for trafficking and slavery in supply chains, (3) requires direct suppliers to certify that materials incorporated into the product comply with the laws regarding slavery and human trafficking in the country or countries in which they are doing business, (4) maintained internal accountability standards, and (5) provides company employees and management, who have direct responsibility for supply chain management, training on human trafficking and slavery. Cal. Civ. Code § 1714.43, *et seq.*

88.      California has also enacted several statutes that directly address human trafficking abuses such as The California Trafficking Victims Protection Act, The Human Trafficking Collaboration and Training Act, the Access to Benefits for Human Trafficking and Other Serious Crime Victims Act as well as various Senate and Assembly Bills that amend current California 41 statutes.

89.      The US Federal government also responded to modern forms of slavery.  In response to the growing concern about slave labor within the supply chains, the United States enacted the Tariff Act Section 307 of the Tariff Act of 1930, 19 U.S.C. §1307, prohibits importing goods made with forced or indentured labor.

90.      In 2000, to expand on sanctions against traffickers and to protect trafficking victims, the U.S. enacted the Victims of Trafficking and Violent Protection Act of 2000. According to the TVPA of 2000: "Congress finds that [a]s the 21st century begins, the degrading institution of slavery continues throughout the world. Trafficking in persons is a modern form of slavery, and it is the largest manifestation of slavery today. *See* 22 U.S.C. § 7101(b)(1).

91.      After analyzing slavery and human trafficking in the supply chain, the TVPA of 2000 stated that "[t]rafficking in persons substantially affects interstate and foreign commerce. Trafficking for such purposes as involuntary servitude, peonage, and other forms of forced labor has an impact on the nationwide employment network and labor market." *Id.* at § 7101 (b)(12). This Act, among other provisions, strengthened sanctions against traffickers, established an Office and Interagency Task Force to Monitor and Combat Trafficking and provided assistance to victims of trafficking by allowing them to seek "T-Visas" to obtain temporary residency in the United States.

92.      In 2003, the U.S. enacted the Trafficking Victims Protection Reauthorization Act of 2003 ("TVPRA of 2003"). The TVPRA of 2003 amended the TVPA of 2000 and, among other things, enhanced the prevention of trafficking in persons, added additional provisions to protect families of trafficked victims, added human trafficking to crimes that can be charged under the

RICO statutes, and established a civil right of action for trafficking victims. The United States continues to address the evolving issues of human trafficking, the TVPA of 2000 by further amended in 2005, 2008, and 2013.

93.     In 2005, the U.S. enacted the Trafficking Victims Protection Reauthorization Act of 2005 ("TVPRA of 2005"). The TVPRA of 2005 further amended the TVPA of 2000 and enhanced the protections for trafficked victims and includes measures to ensure that the U.S. Government personnel and contractors are held accountable for their involvement with acts of trafficking in persons.

94.     Following this amendment, the U.S. Department of Defense incorporated antitrafficking and protection measures for vulnerable populations. Additionally, a $5 million pilot program was established to create residential treatment facilities in foreign countries for victims of trafficking.

95.     In 2008, the U.S. enacted the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA of 2008"). The TVPRA of 2008 was enacted to "authorize appropriations for fiscal years 2008 through 2011 for the Trafficking Victims Protection Act of 2000, to enhance measures to combat trafficking in persons, and for other purposes." The TVPRA of 2008 amended the TVPA of 2000 to include new prevention strategies to combat international trafficking in persons, to ensure the availability of possible witnesses and informants, enhance the sanctions against traffickers, and more.

96.     In 2013 the Trafficking Victims Protection Reauthorization Act of 2013 ("TVPRA of 2013") was passed to, among other improvements, strengthen efforts to "ensure that United States citizens do not use any item, product, or material produced or extracted with use of labor from victims of severe forms of trafficking."

97.     As evidenced throughout these federal statutes, the United States is deeply concerned with national and international human rights abuses and seeks to eradicate these abuses by enacting programs, criminal sanctions, and protections for victims of trafficking. In doing so, the U.S. also sought to prevent consumers from unconsciously sanctioning these human rights violations through their unwitting purchases of tainted supply lines for consumer goods.

98.     Defendant Intel states publicly that it does not tolerate human trafficking and slavery in its supply chain yet it continues to sell merchandise such as computer chips developed or manufactures in Israel by men who are subject to slavery to consumers in CA and elsewhere in the US and the world.

99.     In light of the foregoing, it is clear that Defendant Intel's Participation in the slavery of its Israeli male employees is critical to the tainted products reaching California Consumers. Intel sells its chips to U.S. customers everywhere where computers and laptops are sold. U.S. consumers who buy Intel chips are buying the product that was created through the use of forced labor, chattel labor, and/or slave labor. As stated, due to its power it can and it could have dictated to the State of Israel terms and conditions that would protect the employees in its chain

of supply and production from the horrendous maltreatment of the family courts, supreme court and the Enforcement and Executions Authority.

100.    Defendant Intel knew, or should have known, that it was relying upon forced labor to produce their products. Despite Intel's knowledge of the widespread use of forced labor rampant in Israel and the specific policies prohibiting forced labor, Intel continues to obey the draconian unlawful orders of the family courts, Supreme Court and Enforcement and Collections Authority of Israel.

101.    Defendant's Intel is misleading the public in California and elsewhere by falsely representing that its products are free from slavery when indeed the products are manufactured by employees who are either robbed of their salaries or are forced to quit so as not to continue their servitude.

102.    Such acts of the Defendant Intel as described above, constitute unlawful business practices within the meaning of California Business and Professions Code § 17200.   Defendant Intel's business acts and practices, as alleged herein, also constituted and constitute a continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of § 17200.

103.    Defendant Intel' practices are unlawful in that their conduct in collaborating with the co-defendants regime of child support extortions and full wage garnishments actively contributes to the use of slave labor in violation of bans on such human trafficking enacted by the U.S., California and by international conventions, including but not limited to the Tariff Act of 1930. The Anti-Trafficking in Persons Act, the UN Declaration of Human Rights, and California Penal Code § 236, § 237, *etseq.*

104.    In addition, Defendant Intel's conduct in representing that it enforces policies against the use of slave labor in the computer chips it sells is a violation of Civil Code Section 1714.43.  Intel's practices are also unlawful under California Business and Professions Code Section 17500, *et seq.* and Civil Code Section 1750, *et seq.*

105.    Defendant Intel's practices are fraudulent in that Defendant Intel affirmatively represents that it enforces standards to prohibit the use of slave labor, when in fact it clearly did not.

106.    Defendant Intel's participation in a supply chain tainted with slave labor is immoral, unethical, oppressive, unscrupulous and injurious to consumers.

107.    Defendant Intel's business acts and practices, as alleged herein, have caused harm to Plaintiff and other men in his situation who worked or continue to work at Intel.

108.    As a result of the above violations of Business and Professions Code Section 17200, Plaintiff is entitled to an order enjoining such conduct by Defendants, such orders and judgments that may be necessary, including the appointment of a receiver, to restore to any person in interest any money paid as a result of the acts of Defendants.

109.    Defendant Intel also violated the Misleading and Deceptive Advertising California Business and Professions Code Section 17500, *et seq.* California Business and Professions Code Section 17500 provides that it is unlawful for a corporation "to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated ... from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement ... which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading ..."

110.    Defendant's representations, including statements made in Defendant's television, radio, and print advertising, websites, brochures, and all other written and oral materials disseminated by Defendant contained statements that were false, misleading, or that omitted material information that Defendant were under a duty to disclose and which were known or should have been known to Defendant to be false, misleading or deceptive.

111.    The misleading advertising described herein presents a continuing threat to Plaintiff and members of the public in that Defendant persist and continue to engage in these practices, and will not cease doing so unless and until forced to do so by this Court.

112.    Defendant Intel also violated the Consumer Legal Remedies Act, Civil Code Section 1750, *et seq.* The above acts of Defendant Intel, in selling computer chips that are the product of slave labor, were and are unfair methods of competition and unfair or deceptive acts and practices in violation of the Consumer Legal Remedies Act, Civil Code Section 1750, *et seq.* ("CLRA"). CLRA section 1770(a)(5) prohibits "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."

113.    Defendant Intel violated this provision by making the misrepresentations describe above, including but not limited to, in connection with its Code of Conduct and in selling misleading and inadequately labeled prawns that fail to notify the consumer of unlawful labor abuses in the supply chain. Defendant continues to violate this provision in connection with sales of prawns to Class members.

114.    CLRA section 1770(a)(7) prohibits "representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Defendant violated this provision by making the misrepresentations describe above, including but not limited to, in connection with its Code of Conduct and in selling misleading and inadequately labeled prawns that fail to notify the consumer of unlawful labor abuses in the supply chain. Defendant continues to violate this provision in connection with sales of computer chips designed or manufactured in Israel to California consumers.

115.    CLRA section 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised." Defendant violated this provision by making the misrepresentations describe above, including but not limited to, in connection with its Code of Conduct and in

selling misleading and inadequately labeled prawns that fail to notify the consumer of unlawful labor abuses in the supply chain. Defendant continues to violate this provision in connection with sales of computer chips designed or manufactured in Israel to California consumers.

116.     CLRA section 1770(a)(16) prohibits "representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not."

117.     The violations of the CLRA have caused pecuniary loss to Plaintiff and the California public.

118.     As a result of the above violations of Business and Professions Code Section 17500, and all other authorities above, Plaintiff is entitled to an order of this Court enjoining such future conduct on the part of Defendant.  Thus, Plaintiff seeks to enjoin Defendant's illegal practices tied to the supply chain for Intel computer chips, including:  (a)  an injunction against the further sale of computer chips designed or manufactured in Israel; (b) an injunction prohibiting Intel from selling misleading, or inadequately labelled computer chips that fail to notify the consumer of the conditions described herein; and (c) an injunction prohibiting Intel from continued buying, distributing, and selling products that they know, should know, or suspect to be tainted by slave labor or human slavery.

119.     Plaintiff is entitled to an award of reasonable attorneys' fees under California Code of Civil Procedure Section 1021.5 for the benefit conferred upon the general public of the State of California by any injunctive or other relief entered herein.

## THIRD CASE OF ACTION

120.     Plaintiffs repeat and reallege all facts and circumstances described above as if fully set forth as truth herein.

121.     As stated above, all the other co-defendants except Intel (the "Israeli Defendants") perform various types of judicial capacity in Israel, but they also belong to cult of misandric Radical Feminism, and hence they are sued here also as members of the cult. By so affiliating themselves with the cult, and carrying its mission via their rulings and precedents, the Israeli Defendants committed crimes against humanity that result on 2000 deaths annually, about 10,000 impoverished men each year (with at least 20% becoming homeless), and 20,000-25,000 men denied their rights to raise their children.

122.     The Israeli Defendants replace notions of *Jus Cogens* and fundamental international human rights law with preaching of male hate in its most severe form.  Their judgments influenced by the hate of males can easily be compared with German judges adjudged, against the Jews, in Nazi Germany at 1937 (few years before the final solution) with similar propaganda and rhetoric. The only different between the Israeli court and the Nazis is the excuses for those hate crimes.

123.     In fact, they have turned the State of Israel into one big *Konzentrationslager* by taking all the property and by issuing no exit orders left and right just upon the asking so by a

woman.  Plaintiff himself was under a no exit order for a period of 20 years, even after he became custodian of his daughter.

124.    In addition to having no shame to write and adjudge that women are always superior to men with their parenting skills and are always the best custodian for the children and in addition to making it so easy for a woman to concoct the most ridiculous charges of violence and pedophilia against men, with no repercussions for the false claims whatsoever, these co-Defendants members of the cult have excelled at issuing the most unconscionable and manifest violations of international human rights and the rights to dignity, equality and due process in their decisions concerning child support.  In fact, the Israeli Defendants have turned an entire population of men in Israel (particularly the Jewish ones) into child support slaves.

125.    In order to understand the level of hate mongering, one needs to only take a look at the campaign addressed to women launched by the Enforcement and Collection Authority (the employer of Defendant Dikla Klein Yona), on June 2014, which was aired in television, posters in every government agency, advertisements in newspapers, and almost each and every communications outlet.

126.    In this campaign the women are dressed in military commando outfits as if they are at war with men, and the slogan is "Come to us, let us fight for you to get you the child support you deserve".

127.    See the official poster and flier:



128.    See also the video clip that aired on tv as uploaded by the employer of Dikla Klein Yona to Youtube at:  https://youtu.be/aSEYrroz-x8/



129.    This is a visual admission that the Israeli Defendants declared a war on the Jewish men of
Israel.  However explicit admissions in writing and in English can be found in the Israeli periodic
reports to the UN Committees on Civil and Political Rights and the UN Committee on Economic
Social and Cultural Rights.  Already in 2011 the latter Committee admonished Israel for not
complying with international laws and standards by giving automatic custody to women,
exempting women from child support and imposing an enormous burden on the men, and not
taking measures to prevent more than 200 cases of suicide by men in divorce or divorce
proceedings.

130.    The rules of this war *(Jus ad Bellum)*, succinctly are:  only the man pays child support.  A
woman never has to pay child support because she belongs to the superior sex, no matter how
rich of wealthy she is.  A man has to pay full child support even if he is the custodian of the
children and the woman travels the world. A man also has to pay the one third of the woman's
rent and rent maintenance wherever she chooses as "child support".  A man is also expected to
pay "caretaking fee" when the woman needs a babysitter.

131.    Only the man pays for the transportation costs of visitations and gas.  The child support
never stops, even if the man is sick, crippled, army veteran in PTSD, in bankruptcy, in jail, in
hospital, in mental facility, suffering from terminal cancer, about to die or incapacitated, the
child support never stops.  The woman can also sue the parents of the man if he is unable to pay
her in full or in part.

132.    More rules of the war are:  the child support is not dependent on the man's income, and
the income has nothing to do with child support.  In fact, there is no problem to impose child
support exceeding the income, even twice or three times the income.  The child support begins at
a fixed sum of 1,400 NIS per child (not including school tuitions including private schools and
kindergarten, and 50% of extraordinary expenses such as medical and dental not covered by

insurance, etc.)   All the add-ups amount to about 2,200-2,500 NIS ($600-$675 per-child.  Unlike other countries were the amount escalates moderately with additional children, the fee is fixed and is multiplied per child.

133.    This is in a country with 50% of the population earns minimum wage which is 5,500 NIS (about $1,500), and you cannot rent a studio for less than 2,500 NIS ($675), and the minimum incidentals (city tax, building common fees, electricity, water and gas) are at least another 1,800 NIS ($500).

134.    Assume that a man earns 5,500 NIS ($1,500) and he has 3 children, he will have to pay at least 7,500 NIS ($2,020) in child support.  Where will that person live and how will he be able to afford the $520 shortfall?  Some judges in Israel had no shame telling the men in the courtroom to "go ahead sell a kidney".

135.    The situation at the Execution and Collections Authority can only be described as an inferno. A woman is allowed to open a collection case even if she is owed $0.  She can issue a no exit order immediately, thus using the body of a man as collateral for "future child support".  Also, immediately usurious rates of interest start accumulating on a compounded basis together with cost of living adjustment so that the child support base always go up faster than anyone can imagine.  Not soon thereafter all pension funds are liquidated, all bank accounts are seized, credit cards forbidden, driving license not renewed, and then come the mandatory 21 days in jail, whenever the wife wants to abuse her former husband a little bit more.

136.    All those crimes be done every day behind closed doors of the Israeli Court. Defendants will do everything to drop this case, to make sure this case will never hear.

137.    The Israeli Defendants are responsible for all this torture, and therefore are accountable under the Alien Tort Claims Act.

138.    The Israeli Defendants have no immunity from trial under FSIA.  The exception to foreign sovereign immunity at issue in this case is the state-sponsored terrorism exception, codified at 28 U.S.C. § 1605(a)(7), enacted as part of the comprehensive Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, § 221(a), 110 Stat. 1214 (Apr. 24, 1996).

139.    This statute provides that foreign sovereigns are not immune when money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources ... for such an act if such act or provision of material resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.   See, 28 U.S.C. § 1605(a)(7).

140.    Plaintiff was injured by the actions of the Defendants, which can easily be qualified as *State Terrorism* against men.  He suffered fear of frequent arrests and baseless detentions, a massive libelous "character assassination", post-traumatic stress disorder, sleep deprivation,

heightened emotional nervousness, suicidal tendencies, need for painkillers and medications, loss of wages or earning capacity, loss of job, loss of reputation, and actual impoverishment.

141.    Martin Luther king say about this kind of Judges "You express great anxiety because we are ready to violate laws, but an unjust law is not a law at all". Today I know that an unjust law is a crime against humanity.

142.    Richard Allan Posner an American jurist and economist who was a United States Circuit Judge of the United States Court of Appeals for the Seventh Circuit in Chicago. He criticizes Israeli supreme court judge Aharon Barak for both his theoretical argument and for what Posner portrays as Barak's legacy as the President of Israel's Supreme Court. Posner accuses Barak for acting as "a legal buccaneer," and describes his approach as "usurpative." Justice Aharon Barak does not consider himself a legislator in an absolute and even proportionate way, but by looking at the law as a preliminary draft only; That is, as a starting point and not as an end point. Unfortunately, this is his legacy and his spirit that unlawfully dominate the Israeli court ever since.

143.    Israeli judge moto is "we judge everything" but for themselves they gave unlimited immunity, despite the clear law. This third case of action is against the hate crimes of the Israeli court against me in personal and against humanity and human rights. All Israeli judges and/or Israeli court system in position of conflict of interest in this case. There is a strong relationship between our countries (Israel and USA) and this court of justice is the right place to demand for justice.

144.    Plaintiff is entitled to an award of reasonable attorneys' fees under California Code of Civil Procedure Section 1021.5 for the benefit conferred upon the general public of the State of California by any injunctive or other relief entered herein.

WHEREFORE, Plaintiff requests judgment against the Defendants in the amount of $20,000,000 punitive damages in the amount to be assessed by the court, plus the costs and disbursements of this action, attorney fees, and any other remedy the Court may dee, just and proper.

Dated:  Los Angeles, CA
       April 21, 2020

                                            _____
                                            YEHONATAN KAPACH, plaintiff



FROM:

Yehonaten Kapach
18375 Ventura Blvd
Suit 341  Tarazana
CA , 91356

TO:

Filing Clerk Central District
California Division,
Roybal Courthouse
255 East Temple Street, Suite 180
Los Angeles, CA 90012-4701
213 894-3863

CERTIFIED MAIL

7020 0090 0000 8887 7750

RETURN RECEIPT
REQUESTED

PRIORITY
★ MAIL ★

TRACKED
★★★
INSURED
★

UNITED STATES
POSTAL SERVICE®
~ Domestic and International Use   Label 107PR, May 2014

U.S. POSTAGE PAID
TARZANA, CA
91356
AMOUNT
$14.65
R2304E106128-20

Utility Mailer
10 1/2" x 16"

RETURN RECEIPT
REQUESTED

Ready

PRIORITY
★ MAIL ★

TRACKED
★★★
INSURED
★

UNITED STATES
POSTAL SERVICE®
For Domestic and International Use   Label 107PR, May 2014

Rec

7-13-20

